# Authority of the Chrysler Corporation Loan Guarantee Board to Issue Guarantees

The Chrysler Corporation Loan Guarantee Board has the authority, under § 4(a) of the Chrysler Corporation Loan Guarantee Act, 15 U.S.C. § 1863(a), to issue loan guarantees even though Congress has not appropriated funds in advance to make payments under the guarantees in the event of a default.

The Attorney General concurs in the Comptroller General's opinion (Comp. Op. File B-197380 (April 10, 1980)) that the Board has the authority until December 31, 1983, to issue loan guarantees in the amount up to $1.5 billion of contingent liability for loan principal outstanding at any one time and additional amounts for loan interest.

April 23, 1980

THE SECRETARY OF THE TREASURY

MY DEAR MR. SECRETARY: This is in response to your letter of April 16, 1980, requesting my opinion on the authority of the Chrysler Corporation Loan Guarantee Board, of which you are chairman, to issue guarantees under the Chrysler Corporation Loan Guarantee Act of 1979 (Act), 15 U.S.C. § 1861 *et seq.* You ask whether the Board may issue guarantees even though Congress has not appropriated funds in advance to make payments under the guarantees in the event of a default. You also enclosed an opinion of the Comptroller General, construing the Chrysler guarantee appropriation act, and asked me to indicate whether I concur in his conclusions.

Section 4(a) of the Act, 15 U.S.C. § 1863(a), authorizes the Board to guarantee the payment of principal and interest on loans to Chrysler Corporation. Under § 8(a) of the Act, 15 U.S.C. § 1867(a), loan guarantees extended by the Board may not at any one time exceed $1.5 billion in the aggregate principal amount outstanding. The Board's guarantee authority is further limited by § 15(b) of the Act, 15 U.S.C. § 1874(b), which provides:

> Notwithstanding any other provision of this Act, the authority of the Board to make any loan guarantee under this Act shall be limited to the extent such amounts are provided in advance in appropriation acts.

Almost contemporaneously with the passage of the Act,[1] Congress enacted an appropriation act providing:

> That the following sum is appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 1980:

## DEPARTMENT OF THE TREASURY
## BUREAU OF GOVERNMENT FINANCIAL OPERATIONS
## CHRYSLER CORPORATION LOAN GUARANTEE PROGRAM

> For necessary administrative expenses as authorized by the Chrysler Corporation Loan Guarantee Act of 1979, $1,518,000. Total loan commitments and loan guarantees may be extended in the amount of $1,500,000,000 of contingent liability for loan principal and for such additional sums as may be necessary for interest payments, and commitment is hereby made to make such appropriations as may become necessary to carry out such loan guarantees.

P.L. No. 96–183, 93 Stat. 1319 (1980). The question presented here is whether the appropriation-in-advance condition in § 15(b) of the Act is satisfied by the appropriation act.

Chrysler's prospective underwriters have questioned whether § 15(b)'s condition that amounts be provided in advance in appropriation acts could be construed to require that *funds* be appropriated in advance to make payments under the guarantees in the event of a default, a condition that is not satisfied by the appropriation act. Such a construction is supported by Congress' use of words in § 15(b)—"Limited to the extent such amounts are provided in advance in appropriation acts"—which are almost identical to those in § 401(a) of the Congressional Budget Act of 1974, 31 U.S.C. 1351(a); § 401(a) requires that bills providing "new spending authority" contain provisions limiting such authority "to such extent or in such amounts as are provided in appropriation acts." [2] The legislative history of that Act reveals that § 401(a) was intended to require the appropriation of *funds*.[3] Nonethe-

---

[1] The Chrysler Corporation Loan Guarantee Act was enacted on January 7, 1980; the appropriation act, P.L. No. 96–183, 93 Stat. 1319 (1980), was enacted January 2, 1980.

[2] Section 401(a) is not controlling here because it expressly exempts contracts of guarantees from its coverage, but the similarity in the language could be viewed as an indication that the statutes be construed *pari passu*. *Cf. Northcross* v. *Memphis Board of Education,* 412 U.S. 427, 428 (1973).

[3] The House Report states:

> The bill [Congressional Budget Act of 1974] incorporates backdoor spending into the Congressional budget process. Under new procedures, backdoor spending (such as contract authority, loan authority, and mandatory or open-ended entitlements) could not take effect *until funds were provided* through the appropriations process.

H. Rep. No. 93–658, 93rd Cong., 1st Sess. 17, *reprinted in* [1974] U.S. Code Cong. & Ad. News 3462, 3463 (emphasis supplied).

less, I conclude on the basis of strong countervailing evidence in the legislative history of the Chrysler Corporation Loan Guarantee Act that § 15(b) was not intended to require the appropriation of funds, but rather Congress' approval through the appropriations process of the amount of loans that may be guaranteed by the Board.

The Senate version of § 15(b) reported by the Senate Committee on Banking, Housing and Urban Affairs provided:

> Notwithstanding any other provisions of this Act, commitments to guarantee loans under the Act shall not exceed such limitations on such commitments as are provided in general provisions of appropriation acts.

125 Cong. Rec. S19019 (daily ed. December 18, 1979). The Senate Report explains the intent of the provision:

> The intent of this language is to require that the limitations on loan guarantee authority under this Act be approved in appropriation Acts without making any implication that this action should be construed as conferring budget authority.

S. Rep. No. 93-463, 96th Cong., 1st Sess. 39 (1979).

Section 15(b) was later amended on the floor of the Senate at the request of Senator Proxmire, the chairman of the Senate Committee on Banking, Housing and Urban Affairs, to conform to the provision in the House bill. Explaining that the Senate Appropriations Committee's staff had requested the amendment, Senator Proxmire revealed that the staff was concerned that the Senate version of § 15(b) could be construed to permit the issuance of guarantees without first obtaining approval through the appropriation process:

> It certainly was the intention of the Banking Committee not to go around the Appropriations Committee and not to move into their jurisdiction or provide that there would be a commitment or a guarantee before the Appropriations Committee had an opportunity to pass on it. All this [amendment] does as I say, is to make it conform to our intention, make it conform also to the language in the House bill.

125 Cong. Rec. S19018 (daily ed. December 18, 1979) (remarks of Senator Proxmire).

Urging the adoption of the amendment, Senator Proxmire stated:

> This is not a substantive amendment, and I am sure the Senator [Riegle] will agree when he looks at it. It certainly is in the form of a technical correction. It does not change in any way the intention which was indicated by

14

> the committee and, as I say, it is the same as the House
> language.

*Id.* at S19019.

It is clear from Senator Proxmire's remarks and the Senate Report that the purpose of § 15(b) was to ensure that no guarantees would be issued without first obtaining the approval of Congress through the appropriation process of the total amount that could be guaranteed.[4] This approval was obtained upon the passage of the appropriation act which permitted the Board to issue the full amount of guarantees authorized under the Act.[5]

For the above reasons, I conclude that the Board is empowered pursuant to § 15(b) of the Chrysler Corporation Loan Guarantee Act and P.L. No. 96–183 to issue guarantees even though Congress has not appropriated funds in advance to make payments under the guarantees in the event of a default. I also fully concur in the Comptroller General's opinion including his conclusion that the Board has the authority until December 31, 1983, to issue loan guarantees in the amount up to $1.5 billion of contingent liability for loan principal outstanding at any one time and additional amounts for loan interest. Comp. Op., File B–197380 (April 10, 1980).

Sincerely,
BENJAMIN R. CIVILETTI

---

[4] Senator Muskie, chairman of the Senate Budget Committee, also indicated on the floor of the Senate that under the Act Congress could choose in the appropriation process to limit the level of guarantees rather than appropriate funds to cover possible future defaults. *See* 125 Cong. Rec. S19188 (daily ed. December 19, 1979). Because the guarantees would represent a contingent liability rather than a current outlay, he urged the Senate to choose the former during the appropriation process to avoid including the $1.5 billion guarantee authority in the current budget. *Id.*

[5] Confirming that such approval was sufficient to satisfy the condition of § 15(b), the House Report accompanying the appropriation act stated:

> This urgent appropriation bill provides the necessary authority for the Federal Government to enter into guaranteed loan agreements in an amount not to exceed $1.5 billion for the loan principal.

H. Rep. No. 96–719, 96th Cong., 1st Sess. 1 (1979).